FILED
03 AUG -6 AM 10: 05
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

| KAREN S. EDWARDS, | ] |
| Plaintiff(s), | ] |
| vs. | ] CV-02-CO-1822-E |
| CITY OF ANNISTON, | ] |
| Defendant(s). | ] |



ENTERED
AUG 0 6 2003

MEMORANDUM OF OPINION

I. INTRODUCTION.

Presently before the court is a motion for summary judgment, filed by the defendant on May 30, 2003. [Doc. # 21.] The issues raised therein have been fully briefed by the parties, and are now ripe for decision. Upon due consideration, the court is of the opinion that the motion is due to be granted.

II. FACTS.[1]

A. The parties.

The defendant, the City of Anniston ("the City"), has 420 employees, 130 of which are employed by the Anniston Police Department ("APD"). The APD has three divisions, each headed by a Captain, and all divisions are supervised by the Chief of Police.

---

[1] The facts set out below are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

At all times relevant to the lawsuit, Wayne Chandler ("Chief Chandler") was the Chief of Police, and Captain John Dryden ("Captain Dryden") supervised the Administrative Division until his promotion to the Chief of Police position in May 2002. Plaintiff Karen Edwards ("Ms. Edwards") is the Supervisor of the Records and Communications Unit ("R&C Unit") within the Administrative Division and has been in that position since 1988. She has never received any discipline or been denied any promotion, and the City regards her as a long and valued employee.

    B.   Captain Dryden's supervision of the plaintiff.

Captain Dryden supervised Ms. Edwards from September 2000 to May 2002. Prior to being assigned as Captain of the Administrative Division, he was the Captain of the Uniform Division. After he was assigned to the Administrative Division, but before his assignment took effect, Ms. Edwards told Captain Dryden that she was looking for Captain Ted Northdurft ("Captain Northdurft"), the individual who replaced Captain Dryden as Captain of the Uniform Division. Captain Dryden responded, "Well, he isn't damn here. He hasn't taken over yet. Why don't you use some common sense and use the phone instead of running all over the building like a chicken with its head cut off?" (Edwards Dep. 70-71.)

On September 11, 2001, the R&C Unit received a call from Amtrak security in Atlanta asking that a train coming through Anniston on its way to Birmingham be stopped because "an individual

of Mid-Eastern descent . . . with unknown baggage" was on board. (Edwards Dep. 147.) Ms. Edwards "became the line of communications from the FBI to the people on the site" where the train was stopped. (*Id.* 149.) The next day she was told by Captain Northdurft that he heard that she was "so out of control," that she "didn't know what was going on," and that she was "just totally out of control." (*Id.* 150.) Ms. Edwards testified that Captain Northdurft told her he heard that information from the City Manager and Captain Dryden.

Ms. Edwards testified that "every single day there was a confrontation or an instance where [Captain Dryden] took the opportunity to intimidate, belittle, berate, put me in my place." (Edwards Dep. 299.) For example, Ms. Edwards testified that Captain Dryden would "stand[ ] up and . . . lean[ ] in and . . . invad[e her] space," saying "What's wrong with it? Do you not see an error in that? Is this the kind of work you're going to do? Is this what I can expect from you? Watch what you do before you give it to me. I don't have time to keep on doing this every day." (*Id.* 301.) She further testified that Captain Dryden questioned her decision-making ability in that she "ha[d] to justify just about every decision [she] ma[d]e. He want[ed] some sort of justification for it." (*Id.* 305.)

Ms. Edwards also testified that Captain Dryden undermined her authority with her subordinates. For example, one of Ms. Edwards's

subordinates, Debbie Rooks ("Ms. Rooks"), asked Ms. Edwards for time off for elective surgery during the time period between Thanksgiving and Christmas, which is a busy time of year for the APD because of an increase in shoplifting and burglary. Ms. Edwards's opinion was that Ms. Rooks "had postponed the surgery for four years" and that "it was absolutely [an] abuse of sick leave" for her to ask off during that time. (Edwards Dep. 315.) Ms. Edwards asked Captain Dryden whether it would be legal for APD to ask Ms. Rooks to postpone the surgery until January, but Captain Dryden approved Ms. Rooks's leave. Ms. Rooks later told Ms. Edwards that Captain Dryden told her not to "worry about [Ms. Edwards], he was going to take care of it." (*Id.* 320.)

Finally, Ms. Edwards testified that although R&C Unit employees "should come to [her]" with problems, "it's like a constant trail, people passing back and forth [to Captain Dryden's office.] I'm never even aware of why they're going in there . . . when I do question . . . why did you not come to me. Well, because he was in there and I just wanted to talk to him." (Edwards Dep. 321-22.)

  C. Captain Dryden's allegedly harassing remarks directed at the plaintiff.

In October 2000, Ms. Edwards was at Chief Chandler's desk working on a computer when someone took a Polaroid photograph of her. The photograph was tacked on the bulletin board in the R&C Unit with the caption, "things are worse than we thought," meaning

that she was now the Chief. (Edwards Dep. Ex. 31.) Her reaction to the photograph being tacked to the bulletin board was that she "laughed like everybody else and . . . just went on about [her] business." (Edwards Dep. 233.) Later she saw Captain Dryden showing the photograph to Jonita Roberts ("Ms. Roberts"), an R&C Unit employee, and heard Ms. Roberts say "Ooh, Captain, you wrong for that." (*Id.* 234.) Ms. Edwards asked Ms. Roberts to share the joke, but she declined, so Ms. Edwards "pressed the issue" with Captain Dryden. (Edwards Dep. Ex. 31.) She "was sitting in front of his desk and [she] said, I want to know what you said. He said, no. [She] said, I want to know what you said. And again he said no and [she] leaned across the desk and said I'm not leaving until I know what you said." (Edwards Dep. 235.) With that, Captain Dryden told her that he told Ms. Roberts, "You don't see the Chief in the picture, do you? He is under the desk." (*Id.*) Ms. Edwards surmised that Captain Dryden was implying that Chief Chandler was sexually gratifying her under his desk. (*Id.* 238.)

In November or December 2001, Ms. Edwards, Wendy Acres, and Chief Chandler attended a conference at the Perdido Key Resort. On the day they returned to work, Captain Dryden asked Ms. Edwards, "Which one of y'all slept with the Chief?" (Edwards Dep. 337.) Her response was "Let's not go there. I'm not even going to dignify that with an answer." (*Id.* 343.) Although no one else heard the remark, Ms. Edwards testified that people in the R&C Unit learned

about it and assumed that she slept with Chief Chandler to get her position. (*Id.* 341.)

Ms. Edwards testified that Captain Dryden's wife is "a very good cook," and that Captain Dryden would often bring food his wife had cooked to work and leave it on the break table for public consumption. (Edwards Dep. 266.) On one occasion in which Captain Dryden brought food to work, Ms. Edwards made a comment to the effect that if she did not work, she would "probably cook more or something." (*Id.*) Captain Dryden replied "well, if you were where you belonged, you'd be at home in the kitchen." (*Id.*)

Captain Dryden on one occasion told Ms. Edwards, "The line is drawn in the sand. Choose carefully which side you're on." (Edwards Dep. 289.) She felt that he "was trying to make sure that he had people that he felt like he could count on, that would be subservient to him and obey him." (*Id.* 292.)

> D. Captain Dryden's allegedly harassing remarks directed at others.

Ms. Edwards testified that Captain Dryden "always" referred to Lieutenant Debbie Davis ("Lt. Davis") as a "stupid, fucking bitch." (Edwards Dep. 294.) Ms. Edwards also testified that, although she did not hear Captain Dryden make the following statement, she was told that he told a girl who was pregnant "you might as well be barefoot if you're going to be pregnant." (*Id.* 267.)

When Ms. Edwards and Captain Dryden were interviewing an applicant for an R&C job, he said "I understand it came out in your

Page 6 of 18

polygraph you're pregnant." (Edwards Dep. 297.) When the applicant confirmed it, he asked, "you going to have any problems working shifts with a baby? What are you going to do about day care? You're not married, are you? You're just living with this guy, right?" (*Id.*) Notwithstanding his apparent discomfort with her pregnancy, Captain Dryden offered this particular applicant the job for which she applied.

At a meeting the City Manager held with "middle management people," Angela Goltston (an R&C Unit employee) said "I don't feel safe [in the APD building] and I don't see the justification how city hall can have bulletproof glass and we can't." (Edwards Dep. 308-09.) Captain Dryden was "very irate" and said "I never saw such a bunch of scaredy-cat women." (*Id.* 308, 310.)

Finally, Ms. Edwards testified that Captain Dryden referred to Captain Rick Sanford ("Captain Sanford"), who was the Administrative Division Captain prior to Captain Dryden, as a "weenie," a "wimp," and a "wuss." (Edwards dep. 279-80.) She believes he called Captain Sanford these names because she believes Captain Dryden felt "[y]ou couldn't be a real man and supervise the majority of women." (*Id.* 279.)

    E.   Russell Buckalew.

Russell Buckalew ("Sgt. Buckalew") is a property sergeant who is "on a lower level than" Ms. Edwards. (Edwards Dep. 358.) In October 2000, Ms. Edwards told Sgt. Buckalew "I need you to take

this box to [the City Clerk's] office for shipment." (Edwards Dep. Ex. 31.) Sgt. Buckalew responded, "I respond a lot better when I am asked to do things in the proper manner and I will do the same with you in the future." (*Id.*)

Ms. Edwards received a traffic warning from Sgt. Buckalew in June 2001 for driving 56 miles per hour in a 35 miles per hour zone. After running Ms. Edwards's tag, Sgt. Buckalew radioed for what Ms. Edwards perceived to be an unnecessary warrant check on her, which she found humiliating. Sgt. Buckalew then suggested that the warning ticket be posted on the bulletin board in the R&C Unit, which it was; Ms. Edwards later removed it. It is undisputed that the names of everyone receiving traffic warnings are posted on the bulletin board so officers can see who has received a warning and is due for a ticket for a repeat offense.

    F.   Billy Lett.

In September 2000, Lieutenant Billy Lett ("Lt. Lett"), like Captain Dryden, was transferred to the Administrative Division. Ms. Edwards approached Lt. Lett and told him, "I know [the Administrative Division] is probably not an assignment you would choose for yourself but if there is any way I can help you smooth the transition, I'm here to work with you." (Edwards Dep. 59.) Lt. Lett responded by saying, "Well, you can kiss my ass," and Captain Dryden laughed. (*Id.* 59-60.) Ms. Edwards testified that Lt. Lett

"plays such a minimal part [in the harassment] it's not even worth discussing." (*Id.* 200.)

    G.   Ms. Edwards's complaint to Chief Chandler.

At some point, Ms. Edwards told Chief Chandler "that Captain Dryden was harassing her and that she felt it was in fact sexual harassment." (Chandler Dep. 16.) The only incidents he remembers her relating to him were the "You don't see the Chief in the picture" comment, the "Which of y'all slept with the Chief" comment, and the posting of the warning ticket by Sgt. Buckalew. (*Id.* 17-18.) Because Ms. Edwards did not make a "formal complaint," Chief Chandler did not initiate an investigation. (*Id.* 24.)

    H.   Ms. Edwards receives psychiatric treatment.

In the spring of 2001, Lt. Davis found Ms. Edwards at her desk, staring at her keyboard, crying and unable to speak. Lt. Davis took Ms. Edwards to see Lisa Seymour ("Ms. Seymour"), the City's Human Resources Director. Ms. Edwards told Ms. Seymour that "it's . . . Dryden. It's this and this and this and – nobody's going to do anything. He's a captain, for God's sake, nobody –." (Edwards Dep. 382.) For the next three weeks Ms. Edwards was an outpatient in the psychiatric program at the Regional Medical Center ("RMC") in Anniston, where she was diagnosed with major clinical depression. Before being released from RMC, Ms. Edwards "had to prove [she] could go back to the work place and do [her]

job," and to "confront the issue," she wrote a memorandum setting forth her complaints and presented it at a group session. (*Id*

I.   Meetings with the City Manager.

The day after Ms. Edwards returned to work, she met with City Manager Rick Whitehead ("Mr. Whitehead") and Ms. Seymour. At that meeting, she gave Mr. Whitehead a copy of the memorandum she prepared at RMC. Mr. Whitehead investigated Ms. Edwards's allegations, and in June 2001, he had another meeting with her. At that meeting, Mr. Whitehead told her that "he had conducted an investigation and that he had found that [her] complaint was unfounded." (Edwards Dep. 185.) Mr. Whitehead concluded that there was a personality conflict between Ms. Edwards and Captain Dryden. (*Id*. 414-15.)

J.   Procedural history.

Ms. Edwards filed a charge of discrimination with the EEOC on August 28, 2001, and received a notice of her right to sue on April 26, 2002. Ms. Edwards initiated the instant litigation by filing her complaint on July 24, 2002. [Doc. # 1.] In her complaint, she asserts two claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2000e-17, and 42 U.S.C. § 1983: a sexual harassment claim, and a retaliation claim.[2] The defendant filed the instant motion for summary judgment on May 30, 2003.

---

[2]Ms. Edwards has conceded in her brief in opposition to the defendant's motion for summary judgment that summary judgment is due to be granted as to her retaliation claim.

III. STANDARD.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the evidence] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. In evaluating the arguments of the movant, the court must view the evidence in the light most favorable to the nonmoving party. *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting

Fed. R. Civ. P. 56(e)). "A factual dispute is genuine only if a 'reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991)).

IV. DISCUSSION.

Because Ms. Edwards has conceded that summary judgment is due to be granted as to her retaliation claim, *see supra* note 2, the court need only discuss her sexual harassment claim.[3] Ms. Edwards claims that she was subjected to a hostile environment based on her sex that affected a term, condition, or privilege of her employment.

To prevail on a sexual harassment claim based on alleged harassment perpetuated by a supervisor, an employee must establish: (1) that she belongs to a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on her sex; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis for holding the employer liable. *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 582 (11th Cir. 2000). The fourth element has both a subjective and an objective component; not only must the

---

[3] Because the framework of proof for her claim under Title VII mirrors that under § 1983, *see DeVauthn v. City of Clanton, Ala.*, 992 F. Supp. 1318, 1323 (M.D. Ala. 1997), the court's analysis of the sexual harassment claim applies with equal force to Ms. Edwards's claims under both Title VII and § 1983.

plaintiff establish that she subjectively viewed the harassment as severe or pervasive, she must also show that a reasonable person would perceive the environment as hostile and abusive. *Gupta*, 212 F.3d at 583. The defendant asserts that Ms. Edwards has produced no evidence from which a reasonable factfinder could conclude that any alleged harassment she experienced was based on her sex, or that the harassment was severe or pervasive; as such, the defendant argues, summary judgment is due to be granted. The court will address the defendant's argument with respect to each of these requirements in turn.

    A.   Because of sex.

The Eleventh Circuit has held that in order to be properly considered as part of a hostile environment, instances of alleged harassment "must be of a sexual or gender-related nature – 'sexual advances, requests for sexual favors, [or] conduct of a sexual nature.'" *Gupta*, 212 F.3d at 583 (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999)). "Innocuous statements or conduct, or boorish ones that do not relate to the sex of the actor or of the offended party (the plaintiff), are not counted." *Gupta*, 212 F.3d at 583.

Ms. Edwards complains of several instances of alleged harassment "that no reasonable person would consider to be of a gender-related or sexual nature." *Gupta*, 212 F.3d at 583. The following comments or instances, detailed in the court's statement

of the facts, *supra*, are no in way arguably related to or because of Ms. Edwards's sex, and are therefore not to be considered in the court's analysis of Ms. Edwards's hostile environment claim "except perhaps to serve as a clear example of what" will not support such a claim, *see id.*:

- Captain Dryden's "chicken with its head cut off" comment;
- Captain Northdurft's comment that he heard Ms. Edwards was "totally out of control" on September 11;
- Captain Dryden's invasion of her space with a constant barrage of questions about her work;
- Captain Dryden's questioning of her decision-making;
- Captain Dryden's approval of Ms. Rooks's request for leave;
- R&C Unit employees going to Captain Dryden rather than Ms. Edwards with questions and problems;
- Captain Dryden's reference to the line "drawn in the sand;"
- Sgt. Buckalew's comment that he responds better when asked to do things in the proper manner;
- Sgt. Buckalew's issuance of the traffic warning and subsequent posting of the traffic warning on the bulletin board; and
- Lt. Lett's "kiss my ass" comment.

*See Pipkins v. City of Temple Terrace, Fla.*, 267 F.3d 1197 (11th Cir. 2001) (motivation for allegedly harassing behavior that was attributable to "personal animosity . . . would not meet the Title VII requirement that the alteration of terms and conditions of employment be 'because of . . . sex'"). The court concludes that the balance of the behavior Ms. Edwards complains about is in some way related to or because of her sex or gender, and the court will

proceed to analyze whether those incidents rise to the level of severe or pervasive harassment.

B.   Severe or pervasive.

"If the complained of statements and conduct are of a gender-related or sexual nature," *Gupta*, 212 F.3d at 584, the court must view them in the context of all the circumstances, and in light of four factors, to determine whether they are sufficiently severe or pervasive to have altered the terms or conditions of employment. The four relevant factors are: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance. *Id.*

Ms. Edwards has alleged a number of sex- or gender-based comments that were directed at her:

- Captain Dryden's insinuation that Chief Chandler was sexually gratifying Ms. Edwards under the desk in a photograph;[4]

- Captain Dryden's question "Which one of y'all slept with the Chief?"; and

- Captain Dryden's comment that Ms. Edwards belonged at home in the kitchen.

Additionally, Ms. Edwards alleges that Captain Dryden made several inappropriate comments that were not directed specifically at her:

---

[4]Although this comment was about her, it was not made to her, and Ms. Edwards learned about it only by insisting that Captain Dryden tell her.

- Captain Dryden's constant reference to Lt. Davis as a "stupid, fucking bitch;"
- Captain Dryden's "barefoot if you're going to be pregnant" comment;
- Captain Dryden's comments to a job applicant about her pregnancy;
- Captain Dryden's comment about "scaredy-cat women;" and
- Captain Dryden's reference to Captain Sanford as a "weenie," a "wimp," and a "wuss."

The court agrees with the Seventh Circuit's conclusion that "[w]hen harassing statements are directed at someone other than the plaintiff, the impact of [such] 'second hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Russell v. Univ. of Ill.*, 243 F.3d 336, 343 (7th Cir. 2001). Nonetheless, the court will consider these statements directed at individuals other than the plaintiff in assessing whether a reasonable person would have found the plaintiff's environment hostile and abusive. *See Gupta*, 212 F.3d at 583.

The court concludes, in light of the four factors enumerated above, that Ms. Edwards's allegations fall well short of the sort of behavior sought to be redressed by Title VII's prohibition against sexual harassment. As to the frequency of the allegedly harassing conduct, Ms. Edwards has alleged a total of eight sex- or gender-based incidents, only three of which related to her, occurring over a period of slightly under a year. Ms. Edwards's allegations, from a frequency standpoint, do not amount to the type

of "continuous barrage of sexual harassment" required to support a claim. *Johnson v. Booker T. Washington Broad. Serv., Inc.*, 234 F.3d 501, 509 (11th Cir. 2000).

With respect to the severity of the alleged harassment, the court is of the opinion that the allegations are not of the severity required to support a harassment claim. While some of Captain Dryden's comments may have been offensive, they "are much less severe than the incidents of sexual banter and inappropriate touching described, and found insufficient, by the Second Circuit in *Quinn* [*v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998)] and the Fourth Circuit in *Hopkins* [*v. Baltimore Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996)], for example." *Mendoza*, 195 F.3d at 1249.

Moreover, none of Captain Dryden's comments were physically threatening or humiliating; rather, his alleged harassment amounted to nothing more than mere offensive utterances that, while inappropriate, are not of the type prohibited by Title VII. Because these factors weigh strongly against a finding that Ms. Edwards experienced severe or pervasive sexual harassment, the court concludes that her sexual harassment claim must fail as a matter of law. A holding that the conduct alleged by Ms. Edwards "was sufficiently severe or pervasive to alter her terms or conditions of employment . . . would establish a baseline of actionable conduct that is far below that established by other circuits." *Id.*

at 1251. Summary judgment is due to be granted on Ms. Edwards's claim.

V.   CONCLUSION.

In sum, the court is of the opinion that Ms. Edwards has not adduced sufficient evidence from which a reasonable factfinder could conclude that she was subjected to unlawful sexual harassment. As such, the defendant's motion for summary judgment is due to be, and will be, granted in all respects. The court will enter an appropriate order in conformity with this memorandum of opinion.

Done, this ___6th___ of August, 2003.

L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE

F:\WPDOCS\Coogler\CLERK2\Danielle\Memoranda\DISCRIMINATION  CASES\Gender\Edwards  v. Anniston, CV-02-CO-1822-E, summary judgment opinion sex harassment.wpd